UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EDUARDO JOSE FUENMAYOR OCHOA,<br><br>*Petitioner-Plaintiff*,<br><br>v.<br><br>MARKWAYNE MULLIN, in his official capacity as Secretary of the U.S. Department of Homeland Security, TODD BLANCHE, in his official capacity as Acting Attorney General of the United States, TODD LYONS, in his official capacity as Director of the U.S. Immigration and Customs Enforcement, WILLIAM JOYCE, in his official capacity as Acting New York Field Office Director for U.S. Immigration and Customs Enforcement; ROBERT F. KENNEDY, JR. in his official capacity as Secretary of Health and Human Services; ANGIE SALAZAR, in her official capacity as Acting Director of the Office of Refugee Resettlement; PAUL ARTETA in his official capacity as Warden of Orange County Jail; U.S. Department of Homeland Security; U.S. Immigration and Customs Enforcement; U.S. Department of Health and Human Services; U.S. Office of Refugee Resettlement.<br><br>*Respondents-Defendants*. | Case No.<br><br>**VERIFIED EMERGENCY PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT** |

## I.  INTRODUCTION

1.      This case is about an 18-year-old young man who is a victim of a severe form of trafficking and other serious crimes. He is also eligible for several forms of immigration relief. Nevertheless, Respondents abruptly detained him—transferring him to ICE custody on his 18th birthday—in contravention of federal law and the Constitution.

2.      Eduardo Jose Fuenmayor Ochoa ("Petitioner" or "Eduardo") is an 18-year-old who

1

lived with family in Dallas, Texas prior to his prolonged detention. Eduardo completed some high school in the United States and worked in construction and at a Popeyes Louisiana Kitchen in Dallas to help support his family.

3.      Eduardo is now unlawfully detained in the physical custody of Respondents at the Orange County Jail in Goshen, New York, (Ex. A., Detainee Locator) an adult criminal correction facility known for its abusive conditions that is not safe or appropriate for a teenager.[1]

4.      Eduardo has a long history of severe and complex trauma that has contributed to ongoing physical and mental health issues. Eduardo never had a relationship with his father and was raised by his mother. After his mother left Venezuela, Eduardo lived with his uncle, who physically abused him and forced him to work long hours. He was also physically abused by police in Venezuela on a few occasions.

5.      Eduardo fled Venezuela for the United States when he was around 15 years old because Venezuela was not safe for him. On or around July 16, 2023, Eduardo was placed in the custody of Office of Refugee Resettlement ("ORR") as an unaccompanied child ("UC"). He was then released to his approved sponsor, his mother, on July 25, 2023.

6.      In the United States, Eduardo has also been the victim of multiple serious crimes—. In approximately July 2025, Eduardo was shot by an unknown male, leaving him with lasting physical trauma. In December 2025, while in ORR custody, Eduardo was assaulted by several staff members at the since-shuttered Children's Village facility, which is currently under investigation

---

[1] *See generally Denied Care, Denied Dignity: Systemic Medical Failures in Immigration Detention at Orange County Jail ("Denied Care, Denied Dignity")*, New York Lawyers for the Public Interest (Sept. 2025), https://www.nylpi.org/wp-content/uploads/2025/09/English-OCJ-Health-in-Detention-Report_FINAL.pdf; Mike Randall, *Report Claims ICE Detainees at Orange County Jail Receive Inadequate Medical Treatment*, Middletown Times Herald-Record, (Oct. 15, 2025), https://www.recordonline.com/story/news/local/2025/10/15/report-claims-inadequate-medical-treatment-at-orange-county-jail-ice/86688284007/ (reporting "a pattern of inadequate medical treatment that created grave risks").

for abusing the children in its care.[2]

7.     On August 8, 2025, Eduardo was re-detained and once again placed in ORR custody after an arrest as a juvenile where charges were later dismissed. He was initially placed at Children's Village Staff Secure facility in Dobbs Ferry, New York, more than 1,000 miles from his mother in Texas and his sister in Oklahoma. After two months, Eduardo was "stepped down" to a shelter facility at Children's Village due to his consistent good behavior.

8.     In November 2025, the Office on Trafficking in Persons ("OTIP") identified Eduardo as a victim of a severe form of human trafficking. *See* Ex. B, OTIP Letter.

9.     In January 2026, Eduardo was transferred to yet another facility, after Children's Village received a stop placement order, which upon information and belief, was connected to abuse of children at the facility. In total, Eduardo was detained in ORR and separated from his family for over eight months, despite having an available sponsor (his sister), who had consistently complied with ORR throughout the sponsorship process.

10.    On his 18th birthday, despite a Best Interests Determination from his Child Advocate at The Young Center recommending release to his sister (Ex. C), a post-18 plan for release from Abbott House submitted to ORR (Ex. E), his history of serious and complex trauma and medical concerns (Exs. B and C), and despite multiple assurances that he would be released or discharged to his sister upon aging out of ORR custody (Exs. C, D and E), Eduardo was wrongfully transferred from ORR to adult ICE detention.

11.    Upon information and belief, since his arrival at the Orange County Jail, Eduardo has been isolated in a cell. He has been placed in a medical quarantine for longer than normal times.

---

[2] Priscilla Alvarez, *Exclusive: Beatings, Restraints, And Isolation: Allegations Of Abuse At A Migrant Children's Shelter Trigger Federal Review*, CNN Politics, (Apr. 16, 2026), https://www.cnn.com/2026/04/16/politics/migrant-children-shelter-abuse-allegations?code=CNNPVLG022026 .

3

Eduardo has now been in isolation for at least 10 days and only leaves his cell for 10 to 15 minutes each day to speak to his family on the phone.

12.     Eduardo's arrest and ongoing detention violate his constitutional rights because they serve no lawful purpose and run afoul of the substantive and procedural due process protections of the Fifth Amendment.

13.     Eduardo respectfully asks this Court to hold that his continued detention is unlawful and order his immediate release from custody, or in the alternative, hold a bond hearing.

**PARTIES**

14.     Petitioner-Plaintiff Eduardo is an 18-year-old young man who came to the United States from Venezuela in 2023. He has also been identified as a victim of a severe form of human trafficking by the Office on Trafficking in Persons. On April 4, 2026, ICE arrested Eduardo even though there was a plan for release to his sister from ORR. Eduardo is now detained at Orange County Jail in Goshen, New York.

15.     Respondent Markwayne Mullin is named in his official capacity as the Secretary of the U.S. Department of Homeland Security. In this capacity, he is responsible for overseeing ICE's day-to-day operations, leading approximately 20,000 ICE employees, including Respondent Lyons. Secretary Mullin is the ultimate legal custodian of Eduardo.

16.     Respondent Todd Blanche is the Acting Attorney General of the United States. As Acting Attorney General, Respondent Blanche oversees the immigration court system, including the immigration judges who conduct bond hearings as his designees, and is responsible for the administration of immigration law pursuant to 8 U.S.C. § 1103(g). He is legally responsible for administering Eduardo's removal and bond proceedings, including the standards used in those proceedings, and as such, he is Eduardo's legal custodian. He is sued in his official capacity.

17.     Respondent Todd Lyons is sued in his official capacity as Acting Director of ICE.

As Acting Director of ICE, Respondent Lyons is the legal custodian of Eduardo.

18.     Respondent William Joyce is named in his official capacity as the acting New York Field Officer Director for U.S. Immigration and Customs Enforcement within the United States Department of Homeland Security ("DHS"). In this capacity, he is responsible for the administration of immigration laws and the execution of detention and removal determinations, and is the legal custodian of Eduardo.

19.     Respondent Robert F. Kennedy, Jr. is the Secretary of Health and Human Services ("HHS"). In this capacity, he ultimately oversees the Office of Refugee Resettlement ("ORR"), a sub-component of HHS, that is responsible for the care of unaccompanied minors.

20.     Respondent Angie Salazar is named in her official capacity as Acting Director of the Office of Refugee Resettlement. In this capacity, she oversees the staff of ORR who are responsible for the care of unaccompanied immigrant children.

21.     Respondent Paul Arteta is named in his official capacity as the Warden of Orange County Jail where Eduardo is currently detained. The warden is responsible for the operations of Orange County Jail and is the legal custodian of Eduardo.

22.     Respondent U.S. Department of Homeland Security ("DHS") is an executive department of the United States government headquartered in Washington, D.C. DHS is the parent agency of Immigration and Customs Enforcement and U.S. Citizenship and Immigration Services.

23.     Respondent U.S. Immigration and Customs Enforcement ("ICE") is a component agency of DHS and is responsible for enforcing federal immigration law, including the detention and removal of immigrants.

24.     Respondent U.S. Department of Health and Human Services ("HHS") is an executive department of the United States government headquartered in Washington, D.C. HHS

5

is the parent agency of the Office of Refugee Resettlement.

25.     Respondent Office of Refugee Resettlement ("ORR") is a component agency of HHS and is responsible for the care, custody, and well-being of unaccompanied immigrant children.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction under 28 U.S.C. § 2241 (habeas corpus); Art. I § 9, cl. 2 of the U.S. Constitution (Suspension Clause), 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1651 (All Writs Act), and 5 U.S.C. § 701 (the Administrative Procedure Act). This Court has additional remedial authority under 28 U.S.C. §§ 2201-02 (the Declaratory Judgment Act) to grant injunctive and declaratory relief.

27.     Federal district courts have jurisdiction to hear habeas claims brought by noncitizens challenging the lawfulness of their detention. *See Demore v. Kim*, 538 U.S. 510, 516-17 (2003) (recognizing habeas jurisdiction over immigration detention challenges); *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001) (same).

28.     Venue is proper in this District under 28 U.S.C. §§ 1391(b) and (e)(1) because Eduardo was detained within the Southern District of New York when this petition was filed, his immediate physical custodian was located within this District, and a substantial part of the events giving rise to this petition occurred and continue to occur within this District.

## FACTUAL ALLEGATIONS AND PROCEDURAL HISTORY

29.     Eduardo was born on April 4, 2008. Eduardo was raised by his mother, and his father was never a part of his life. In or around 2022, Eduardo's mother left Venezuela for the United States, leaving him in the care of his uncle. However, Eduardo's uncle abused him severely, beating him and forcing him to work long hours.

30.     Eduardo came to the United States in 2023, when he was around 15 years old.

Eduardo was initially placed in ORR custody; however, he was released to his mother only eight days later, on July 25, 2023.

31.    Eduardo completed some high school in Texas and worked to support his family. He worked to help support his mom and he would also send money to his grandfather.

32.    Eduardo is eligible for several forms of immigration relief. As the victim of several qualifying crimes in the United States for which he has demonstrated willingness to assist law enforcement, Eduardo is likely eligible for U nonimmigrant status under 8 C.F.R. § 214.14. Further, as a young person who is under 21 years old, unmarried, and who has been abandoned by his father, Eduardo is eligible for Special Immigrant Juvenile Status under 8 C.F.R. § 204.11.

33.    Eduardo experienced trauma and abuse in the United States prior to and during his lengthy detention. On July 4, 2025, Eduardo was shot in the arm and chest by an unknown person. He spent 5 days hospitalized for his gunshot wounds and continues to suffer medical complications related to the injury. After Eduardo was released from the hospital, he spoke with a detective with the Dallas Police Department and willingly provided a statement to a detective in connection with the shooting.

34.    Prior to entering ORR custody, Eduardo was on probation stemming from nonviolent charges of theft in Texas while he was a minor. However, this should not affect his ongoing unlawful detention, and Eduardo completed his probation on April 3, 2026. In general, the juvenile justice system is distinct from the adult system because adolescents are developmentally different from adults in terms of maturity and judgment, and because they have a greater capacity for rehabilitation.[3] The Supreme Court has held that as a result of this distinction,

---

[3] Sarah Diaz et al., *No Second Chance: The Inappropriate Use of Juvenile Delinquencies in Immigration Law Adjudications*, 7 Amer. Immigr. Law. Ass'n L. J. 95, 98 (Oct. 20, 2025), https://www.aila.org/library/no-second-chance-the-inappropriate-use-of-juvenile-delinquencies-in-immigration-law-adjudications (noting that "Key cognitive and behavioral features mark [adolescence], including differences in brain structure and function,

youth are "categorically less culpable" than adults[4] and that criminal conduct as a child should not be considered indicative of adult character and behavior.[5] Eduardo's child advocate notes that "his criminal history is not violent" and that it did not warrant preventing or delaying his release from ORR custody. *See*, Ex. C.

35.    On August 3, 2025, Eduardo was arrested on the non-violent charge of evading arrest, which has since been dismissed. Five days after his arrest in Texas and while he was still recovering from his gunshot wounds, ICE arrested and detained Eduardo without notice, presumably connected to this juvenile arrest, moving him to ORR custody in New York State. The charges that led to his detention were later dismissed.

36.    On March 16, 2026, Eduardo underwent surgery while in ORR custody to remove a bullet from his arm. After surgery, Eduardo was at risk of pneumothorax and blood clots. To this day, Eduardo continues to suffer from pain in his right arm where he was shot.

37.    According to ORR records, Eduardo does not present a risk to himself, his sponsor, or the community. Further, while he was initially admitted to Staff Secure detention at Children's Village, he was subsequently stepped down to shelter status on October 3, 2025, due to his good conduct. *See*, Ex. C. In his discharge summary prior to his transfer to Abbott House, his Case Manager at Children's Village stated that Eduardo "receptive, participates in clinical sessions, and continues to practice coping skills." *Id*.

38.    Eduardo's history of complex trauma and abuse by trusted adults in his life made his time in ORR custody particularly difficult. In November 2025, Eduardo was identified as a

---

increased experimentation and risk-taking, heightened sensitivity to peer influence, poor self-control, and a tendency to prioritize immediate rewards over long-term consequences...juveniles typically have diminished culpability compared to adults").
[4] *Roper v. Simmons*, 543 U.S. 551, 567 (2005).
[5] *Id.* at 551.

person who was subjected to a severe form of human trafficking by the Office on Trafficking in Persons, due to his uncle's abuse in Venezuela. *See* Exs. B, C. In December 2025, Eduardo was physically assaulted by staff in ORR.

39.     On January 29, 2026, Eduardo was abruptly transferred to Abott House Shelter in Irvington, New York after a stop placement order was issued at Children's Village. The stop placement order came following allegations of severe abuse against children by Children's Village staff members, including beatings, extended isolation in a confined space, and prolonged physical restraints.[6] Eduardo was one of the children subject to severe physical abuse by staff while detained. Following this incident, on February 20, 2026, Eduardo was also diagnosed with Generalized Anxiety Disorder and Insomnia. *Id*.

40.     Despite his history of trauma, abuse, and neglect, ORR unnecessarily delayed the sponsorship process for Eduardo's sister, prompting his TVPRA-Appointed Child Advocate from the Young Center to recommend that ORR "apply an exception and release Eduardo to his sponsor, Ms. Fuenmayor, immediately." Ex. C.

41.     Eduardo spent over eight months detained by ORR. During that time, no neutral arbiter assessed whether his detention was proper. This prolonged detention exacerbated the mental health concerns caused by Eduardo's previous traumatic experiences, causing him detention fatigue, anxiety, and difficulty sleeping. Ex. C.

42.     A recent study by Children's Rights documented the experiences of young adults in congregate placements in New York State and analyzed the impacts congregate placements had

---

[6] Priscilla Alvarez, *Exclusive: Beatings, Restraints, And Isolation: Allegations Of Abuse At A Migrant Children's Shelter Trigger Federal Review*, CNN Politics, (Apr. 16, 2026), https://www.cnn.com/2026/04/16/politics/migrant-children-shelter-abuse-allegations?code=CNNPVLG022026 .

on participants.[7] The study concluded that "[c]ongregate placements," such as the facility where Eduardo was detained, "inflict deep trauma that causes youth to deteriorate physically, mentally, and emotionally."[8]

43.     No amount of time in detention is safe for children, but the longer the government detains a child, the more profound the harm.[9] As children remain in custody for longer and longer, their mental and physical health deteriorates. The United States Department of Health and Human Services Office of Inspector General has reported that "some children [in ORR custody] who did not initially exhibit mental health or behavioral issues began reacting negatively as their stays grew longer . . . longer stays resulted in higher levels of defiance, hopelessness, and frustration among children, along with more instances of self-harm and suicidal ideation."[10] Mental health clinicians "described that a child's mental health often deteriorates as the length of their stay in ORR custody increases"[11] and noted that "because of the restrictive nature of custody settings, the protective and resilience factors that many children possess gradually erode over time in detention."[12]

44.     Upon information and belief, Eduardo was supposed to be "released with monitoring" to his sister in Oklahoma after aging out of ORR detention, per the recommendation of administrators at Abbott House, the ORR facility where he was detained immediately prior to

---

[7] *See* Sarah Fathallah & Sarah Sullivan, *Away From Home – Youth Experiences of Institutional Placements in Foster Care*, Think of Us (July 21, 2021), https://assets.website-files.com/60a6942819ce8053cefd0947/60f6b1eba474362514093f96_Away%20From%20Home%20-%20Report.pdf.

[8] *Id* .at 4.

[9] Elizabeth S. Barnert, M.D., et al., *How Does Incarcerating Young People Affect their Adult Health Outcomes?*, Pediatrics J. of the Am. Acad. of Pediatrics at *10 (Feb. 1, 2017), https://pmc.ncbi.nlm.nih.gov/articles/PMC5260153/.

[10] C*are Provider Facilities Described Challenges Addressing Mental Health Needs of Children in HHS Custody*, U.S. Dep't of Health and Hum. Servs., Off. of the Inspector Gen., OEI-09-18-00431, 1, 12 (Sept. 4, 2019), https://oig.hhs.gov/documents/evaluation/3153/OEI-09-18-00431-Complete%20Report.pdf.

[11] *Id.* at 20.

[12] Neha Desai et al., *The Unraveling of ORR: A Quick and Calculated Undoing of a System Intended to Protect Children,* Nat'l Ctr. for Youth L., 1, 18 (Sept. 2025), https://youthlaw.org/wp-content/uploads/ncyl_the-unraveling-of-orr_sept2025_final.pdf.

his 18th birthday. *See* Exs. D, Declaration of Dalilah Negrete and E, Post-18 Plan. Although Eduardo was involved in several non-violent behavioral incidents at the ORR facility, such behavioral issues are common among children who have survived trauma and who have experienced prolonged detention. Studies have confirmed that "anxiety, depression, and problematic behavior have a high likelihood of emerging after exposure to childhood adversity"[13] and that adverse childhood experiences, "particularly child maltreatment, has a detrimental effect on mental health outcomes; however, the synergistic effects of experiencing cumulative [adverse childhood experiences]...[results in] maladaptive outcomes, such as increased behavioral and psychological problems."[14] Eduardo's minor behavioral incidents during his detention did not deter ORR staff from putting forth their plan to release him to his sister's custody. *See* Ex. E. Though Abbott House documented that Eduardo displayed, at times, "aggressive behaviors" during his time at Abbott House shelter, this frustration was likely due to his lengthy detention and uncertainty about his release, coupled with his history of trauma and mental health issues such as anxiety and insomnia. Reports of prolonged detention at ORR have found that "children's experiences in ORR custody are characterized by these exact factors: they are restricted in their autonomy and agency, they have little knowledge or control over requirements or processes for release, they feel helpless in their circumstance, they experience chronic worry about their well-being (or that of their loved ones), and they experience various barriers to engaging with the coping and support resources that have traditionally helped them."[15]

45.    However, instead of releasing Eduardo as planned, on April 4, 2026, Eduardo was

---

[13] Tenah K. A. Hunt et al., *Adverse Childhood Experiences and Behavioral Problems in Middle Childhood*, 67 Child Abuse & Neglect, 391, 393 (May 2017).

[14] Quan Zhou et al., *Longitudinal Effects of Cumulative Adverse Childhood Experiences on Internalizing and Externalizing Problems in Adolescents in Out-of-Home Care: Emotional Dysregulation as a Mediator*, Adversity and Resilience Science, 413, 414 (2025), https://link.springer.com/article/10.1007/s42844-024-00161-0.

[15] Neha Desai et al., *supra* at note 12.

detained by ICE, and brought to 26 Federal Plaza, where he was held for about a day and a half.

46.    Eduardo is now detained at Orange County Jail, an adult jail known for its poor conditions,[16] At only 18 years old, Eduardo is one of the youngest detainees to be held at this adult criminal correctional facility.

47.    Since arriving at the Orange County Jail on April 5, 2026, Eduardo has been on medical hold; consequently, he is only able to leave his cell for approximately 10 minutes a day. He sleeps on a small cot that hurts his back and while he has been able to speak to his sister, he has had trouble talking to his mother due to lack of funds. He reports that he is not eating much because of the poor food quality. He also continues to experience pain in his arm where he was shot but had yet to receive medication or treatment at the time this petition was filed.

## LEGAL FRAMEWORK

### Legal Framework and Policies Governing Custody and Release of Immigrant Children

48.    Each year, thousands of children flee violence, persecution, and abuse in their home countries, and seek protection in the United States. Many of these children come from countries where gang violence, government corruption, and instability create conditions that make these regions among the most dangerous for children. According to the United Nations, nearly two-thirds of immigrant children from these regions have experienced harms that qualify them for international refugee protection. Federal law recognizes that minors are distinctively vulnerable and establishes a child-welfare framework, not a carceral one, to govern their custody and release.

49.    In the 1980s and 1990s, immigrant children who arrived to the United States were routinely locked up for months in unsafe and unsanitary jail cells, in remote facilities across the country. These conditions prompted a federal lawsuit, *Flores v. Reno*, which resulted in a 1997

---

[16]*Denied Care, Denied Dignity*, *supra* note 1; Randall, *supra* note 1 (reporting "a pattern of inadequate medical treatment that created grave risks").

12

consent decree that set national standards for the detention, release, and treatment of immigrants in government custody. In addition to setting certain minimal detention standards, *Flores* guarantees that children shall be released "without unnecessary delay" and requires the Government to undertake "prompt and continuous efforts" towards family reunification, as well as guarantees children the right to a bond hearing before an immigration judge. Although the government has attempted to replace *Flores* by regulation, federal courts have preserved its core protections for decades. In 2024, after HHS promulgated comprehensive regulations governing the Unaccompanied Children ("UC") program, the *Flores* court partially terminated the consent decree as to HHS, finding that the new rule "meets or exceeds" *Flores*'s key standards, while leaving *Flores* in place as to DHS.

50.     In 2002, Congress passed the Homeland Security Act ("HSA"), [17] which transferred the care and custody of unaccompanied immigrant children from the Immigration and Naturalization Service[18] ("INS") to the Office of Refugee Resettlement ("ORR"), housed within the Department of Health and Human Services. ORR is not a security agency; its mission is to "incorporat[e] child welfare values" into the care and placement of unaccompanied immigrant children.

51.     Congress further codified and strengthened these protections. The 2008 William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA") requires that (1) DHS transfer unaccompanied children to HHS custody within 72 hours (absent exceptional circumstances), 8 U.S.C. § 1232(b)(3); (2) ORR "promptly place[]" such children "in the least restrictive setting that is in the best interest of the child," *id*. § 1232(c)(2); and (3) with limited exceptions not relevant here, place them in full removal proceedings under 8 U.S.C. § 1229a rather

---

[17] Pub. L. No. 107-296 (codified at 6. U.S.C. 101 et seq. (2002)).
[18] The INS is the predecessor agency to ICE.

than expedited removal, *id*. § 1232(a)(5)(D).

52.    ORR's online guide[19] also contains procedures governing the release of children in its care. The guide provides for ORR to "begin[] the process of finding family members and others who may be qualified to care for an unaccompanied alien child as soon as the child enters ORR's care." ORR also has policies and procedures that "require the timely release of children and youth to qualified parents, guardians, relatives or other adults, referred to as 'sponsors.'"

53.    In 2024, HHS/ORR issued the Unaccompanied Children Program Foundational Rule—the first comprehensive, binding regulations governing ORR's custody, care, placement, and release of unaccompanied children. 45 C.F.R. part 410 (effective July 1, 2024). The rule formalizes long-standing *Flores*/TVPRA principles: child-welfare decision-making; least-restrictive placement; prompt family reunification with appropriate sponsor vetting; access to counsel and supportive services; and robust grievance, oversight, and monitoring structures. It became effective July 1, 2024.

54.    Critically, the law's "least restrictive setting" and "best interests" mandates are not satisfied by mere transfer to ORR; they require prompt reunification or release to a suitable sponsor whenever safe and feasible. Congress charged ORR with making "continuous efforts" toward family placement, and ORR's governing policies prioritize release to a parent, legal guardian, or other qualified adult relative able to provide care and physical custody. *See* 6 U.S.C. § 279(b)(1)(C)–(D); 8 U.S.C. § 1232(c)(2).

55.    In other words, the system is designed to avoid exactly what DHS did here: separating a child from a safe placement only to re-institutionalize him. Where a child already resides safely with a caregiver in the community, seizing the child and funneling him into shelter-

---

[19] *ORR Unaccompanied Alien Children Bureau Policy Guide*, ORR (Aug. 8, 2025), https://acf.gov/policy-guidance/unaccompanied-children-bureau-policy-guide.

level custody (or any more restrictive placement) is the opposite of "least restrictive" and serves no best-interest rationale. Similarly, transferring a child to ICE custody rather than returning him to his family, as was recommended and approved, serves no best-interest rationale.

**Legal Background: Protections for Unaccompanied Children Who Turn Eighteen**

56.     The 2013 amendment to the Trafficking Victims Protection Reauthorization Act (TVPRA) furthers the statute's goal by providing procedural safeguards for Unaccompanied Alien Children (UACs) in ORR custody who "age-out" upon turning 18, reflecting a Congressional intent to "continue to protect vulnerable young people past the age of eighteen." *Lopez v. Sessions,* No. 18-cv-4189, 2018 WL 2932726, at \*9 (S.D.N.Y. June 12, 2018). Upon introducing the TVPRA in the Senate, Sen. Feinstein stated it "seeks to protect children . . . who have escaped traumatic situations" and "ensure that unaccompanied minors in temporary Federal custody are treated as children and not as criminals." 154 Cong. Rec. S10886 (daily ed. Dec. 10, 2008) (statement of Sen. Feinstein). Respondents' treatment of Allan flouts Congressional intent.

57.     TVPRA safeguards require ICE to "consider placement in the least restrictive setting after taking into account the alien's danger to self, danger to the community, and risk of flight." 8 U.S.C. § 1232(c)(2)(B). The risk factors must "drive[]" the decision whether to detain or not, which cannot be "subordinate[d]" to factors outside § 1232(c)(2)(B). *Garcia Ramirez v. ICE*, 812 F. Supp. 3d 86, 102 (D.D.C. 2025). After weighing all factors, ICE "must" "consider placing each and every age-out in the least restrictive setting available for that individual . . . and more broadly," "must make a variety of detention alternatives available for age-outs." *Garcia Ramirez v. ICE*, 471 F. Supp. 3d 88, 181–82 (D.D.C. 2020). *See also* Settlement Agreement, *Garcia Ramirez v. DHS*, No. 18-cv-508, ECF No. 402-1 (D.D.C. Sept. 1, 2022); *Garcia Ramirez*, 471 Fupp. 3d at 175–82, 191 (finding ICE violated its statutory obligations to make placement determinations for age-outs because it failed to consider the least restrictive setting after taking

into account the factors identified in the statute); *Garcia Ramirez v. ICE*, 568 F. Supp. 3d 10, 47 (D.D.C. 2021) (issuing permanent injunction against further violations).

58.     In October 2025, ICE adopted a new policy stating that (i) age-outs are subject to mandatory detention under § 1225(b)(2)(A), and (ii) age-outs must be detained unless they qualify for parole under 8 U.S.C. § 1182(d)(5). *See Garcia Ramirez*, 812 F. Supp. 3d at 94. On a motion to enforce, the *Garcia Ramirez* court enjoined the new policy, finding that it "has led, and would continue to lead, to non-compliant age-out placements, depriving age-outs of the protections Section 1232(c)(2)(B) affords." *Id.* at 111. While the court stated it need not determine whether § 1225(b)(2)(A) ever applied to age-outs, *id.* at 99, it concluded that § 1232(c)(2)(B) "governs the custody of age-outs and overrides Section 1225(b), the more general provision." *Id.* at 103.

**The INA's Custody Statutes**

59.     The INA describes three detention authorities that pertain to the majority of detained noncitizens in removal proceedings. First, 8 U.S.C. § 1226 authorizes the detention of noncitizens in standard removal proceedings before an immigration judge. *See* 8 U.S.C. § 1229a; *see also Jennings v. Rodriguez*, 583 U.S. 281, 288 (2018) ("Section 1226(a) sets out the default rule: The Attorney General may issue a warrant for the arrest and detention of [a noncitizen] 'pending a decision on whether the [noncitizen] is to be removed . . . [and] [e]xcept as provided in [1226(c)],' the Attorney General 'may release' [a noncitizen] detained under § 1226(a) 'on … bond'"). Individuals in § 1226(a) detention are entitled to a bond hearing at the outset of their detention, *see* 8 C.F.R. §§ 1003.19(a), 1236.1(d), while noncitizens who have been arrested, charged with, or convicted of certain crimes are subject to mandatory detention, *see* 8 U.S.C. § 1226(c).

60.     Second, the INA provides for mandatory detention of noncitizens subject to expedited removal under 8 U.S.C. § 1225(b)(1) and for other recent arrivals who are "seeking

admission," described under § 1225(b)(2).

61.    Lastly, the INA also provides for detention of noncitizens who have a final administrative order of removal, including individuals in withholding-only proceedings, *see* 8 U.S.C. § 1231(a)–(b).

62.    The detention provisions at § 1226(a) and § 1225(b)(2) were enacted as part of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) of 1996, Pub. L. No. 104–208, Div. C, §§ 302–03, 110 Stat. 3009-546, 3009–582 to 3009–583, 3009–585. Section 1226(a) was most recently amended in early 2025 by the Laken Riley Act, Pub. L. No.119-1, 139 Stat. 3 (2025).

63.    Following the enactment of the IIRIRA, EOIR drafted new regulations explaining that, in general, people who entered the country without inspection were not considered detained under § 1225 and that they were instead detained under § 1226(a). *See* Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997).

64.    As a result, for nearly 30 years, most people who entered without inspection and were placed in removal proceedings received bond hearings, unless their criminal history rendered them ineligible pursuant to 8 U.S.C. § 1226(c). That practice was consistent with many more decades of prior practice, in which noncitizens who were not deemed "arriving" were entitled to a custody hearing before an IJ or other hearing officer. *See* 8 U.S.C. § 1252(a) (1994); *see also* H.R. Rep. No. 104-469, pt. 1, at 229 (1996) (noting that § 1226(a) simply "restates" the detention authority previously found at the prior § 1252(a)).

**DHS and DOJ's Abrupt Policy Change on Bond Eligibility**

65.    On July 8, 2025, ICE, "in coordination with" the Department of Justice (DOJ),

announced a new policy that rejected the well-established understanding of the statutory framework and reversed decades of practice. The new policy, titled "Interim Guidance Regarding Detention Authority for Applicants for Admission," claimed that all persons who entered the United States without inspection were now subject to no-bond detention under § 1225(b)(2)(A).[20] The policy applies regardless of when a person is apprehended and affects those who have resided in the United States for months, years, and even decades.

66.    On September 5, 2025, the BIA adopted this same position in a published decision, *Matter of Yajure Hurtado*. 29 I&A Dec. 216 (BIA 2025). There, the Board held that all noncitizens who entered the United States without admission or parole are subject to detention under § 1225(b)(2)(A) and are ineligible for IJ bond hearings.

67.    Since Respondents adopted these new policies, federal courts have overwhelmingly rejected their new interpretation of the INA's detention authorities within the jurisdiction of the Second and Third Circuits. *See Zumba v. Bondi*, No. 25-cv-14626, 2025 WL 2753496, at *8 (D.N.J. Sept. 26, 2025) ("Petitioner has the far better argument."); s*ee also Mata Velasquez v. Kurzdorfer*, No. 25-cv-493 (LJV), 2025 WL 1953796 (W.D.N.Y. July 16, 2025); *Lopez Benitez*, No. 25-cv-5937, 2025 WL 2371588 (S.D.N.Y. Aug. 8, 2025); *Samb v. Joyce*, No. 25-cv-6373 (DEH), 2025 WL 2398831 (S.D.N.Y. Aug. 19, 2025); S*avane v. Francis*, No. 1:25-cv-6666, 2025 WL 2774452 (S.D.N.Y. Sept. 28, 2025); *J.U. v. Maldonado*, No. 25-cv-04836, 2025 WL 2772765 (E.D.N.Y. Sept. 29, 2025); *Artiga v. Genalo*, No. 25-cv-5208, 2025 WL 2829434 (E.D.N.Y. Oct. 5, 2025); *Hyppolite v. Noem*, No. 25-cv-4304, 2025 WL 2829511 (E.D.N.Y. Oct. 6, 2025); *Tumba Huamani v. Francis*, No. 25-cv-8110, 2025 WL 3079014 (S.D.N.Y. Nov. 4, 2025); *Diallo v. Maldonado*,

---

[20] *See ICE Issues Memo Eliminating Bond For All Applicants For Admission*, Immigration Policy Tracking Project (last visited Apr. 16, 2026), https://immpolicytracking.org/policies/ice-issues-memo-eliminating-bond-hearings-for-undocumented-immigrants/#/tab-policy-documents.

No. 25-05740, 2025 WL 3158295 (E.D.N.Y. Nov. 12, 2025); *Barco Mercado v. Francis*, No. 25-cv- 6582, 2025 WL 3295903, at *13–14 (S.D.N.Y. Nov. 26, 2025) (collecting cases).

68.    Similarly, dozens of district courts around the country have rejected this interpretation. S*ee, e.g., Rodriguez Vazquez v. Bostock*, 802 F.Supp.3d 1297, 1304 n.3 (W.D. Wash. Sept. 30, 2025) (citing over 20 district court decisions rejecting the government's position); *Ochoa Ochoa v. Noem*, No. 25-cv-10865, 2025 WL 2938779, at *5 (N.D. Ill. Oct. 16, 2025) (collecting 20 cases in note 8 and accompanying discussion).

69.    Courts have almost uniformly rejected DHS's and DOJ's new interpretation because it defies the plain text of the INA. *See Mugliza Castillo v. Lyons*, No. 25-cv-16219 (MEF), 2025 WL 2940990, at *1 (D.N.J. Oct. 10, 2025) ("But as a matter of plain-text reading, it is § 1226(a) that applies to people situated like the Petitioner, not § 1225(b)(2)(A)."). Section 1226(a) applies by default to all persons "pending a decision on whether the [noncitizen] is to be removed from the United States." 8 U.S.C. § 1226(a). These removal hearings are held under § 1229a, to "decid[e] the inadmissibility or deportability of a[] [noncitizen]." 8 U.S.C. § 1229a(a)(1).

70.    The text of § 1226 explicitly applies to people charged as being inadmissible, including those who entered without inspection. *See* 8 U.S.C. § 1226(c)(1)(E). Subparagraph (E)'s reference to such people makes clear that, by default, such people are afforded a bond hearing under subsection (a). As the *Rodriguez Vazquez* court explained, "[w]hen Congress creates 'specific exceptions' to a statute's applicability, it 'proves' that absent those exceptions, the statute generally applies." *Rodriguez Vazquez v. Bostock,* 779 F. Supp. 3d 1239, 1257 (W.D. Washington) (citing *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 400 (2010)); *see also Gomes v. Hyde*, No. 25-cv-11571-JEK, 2025 WL 1869299, at *7 (D. Mass. July 7, 2025); *Lopez-Campos v. Raycraft*, No. 25-cv-12486, 2025 WL 2496379, at *8 (E.D. Mich. Aug. 29, 2025).

19

71.    As district courts have found, the statutory bars to a bond hearing for inadmissible noncitizens with specific types of criminal history would all be rendered surplusage if in fact no inadmissible noncitizens were eligible for bond. *See Artiga*, 2025 WL 2829434, at *7; *Hyppolite*, 2025 WL 2829511, at *10.

72.    In contrast, § 1225(b) applies to people arriving at U.S. ports of entry or who recently entered the United States. The statute's entire framework is premised on inspections at the border of people who are "seeking admission" to the United States. 8 U.S.C. § 1225(b)(2)(A). *See Rivera Zumba*, No. 25-cv-14626, 2025 WL 2753496, at *8 (D.N.J., Sept. 26, 2025). Indeed, the Supreme Court has explained that this mandatory detention scheme applies "at the Nation's borders and ports of entry, where the Government must determine whether a[] [noncitizen] seeking to enter the country is admissible." *Jennings*, 583 U.S. at 287.

73.    Eduardo is not seeking admission; he has lived in the U.S. since about July 2023. He was previously detained in ORR and then released to his mother mere weeks later before his unlawful re-detention in August 2025.

74.    Accordingly, the mandatory detention provision of § 1225(b)(2)(A) does not apply to people like Eduardo, who have already entered and were residing in the United States at the time they were arrested.

**Detention Without Individualized Review**

75.    DHS officers must make an individualized determination of all persons detained under 8 U.S.C. § 1226(a) that takes into consideration whether the person (1) is a "danger to property or persons" and (2) is "likely to appear for any future proceeding." 8 C.F.R. § 1236.1(c)(8).

76.    Likewise, when government action affects an individual liberty interest, the Due Process Clause of the Fifth Amendment requires consideration (1) the private interest to be

affected, (2) the risk of erroneous deprivation of the procedures used, and (3) the government's interests, including the burden of any additional procedural safeguards imposed. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Accordingly, courts have held that re-detention absent an individualized determination as to flight risk and dangerousness violates due process. *See*, e.g., *Hyppolite,* 2025 WL 2829511, at *13-15 (holding that ICE's arrest of a noncitizen at his immigration court hearing without an individualized determination of danger and flight risk violated his procedural due process rights); *Chipantiza-Sisalema v. Francis,* No. 25-cv-5528, 2025 WL 1927931, at *3 (S.D.N.Y. July 13, 2025) (holding that ICE's re-detention of the petitioner at her immigration court hearing after she had previously been released on recognizance violated her procedural due process rights); *cf. Arias Gudino v. Lowe,* 785 F.Supp.3d 27, 44-46 (M.D. Pa. 2025) (finding re-detention without notice likely violated procedural due process under *Mathews*).

## Remedies in Immigration Habeas Petitions

77.    The "flexible nature" of habeas relief affords district courts significant discretion over the appropriate remedies for violations of law and the Constitution. *See Rivera Zumba,* 2025 WL 2753496, at *11; *Velasco Lopez v. Decker*, 978 F.3d 842, 855 (2d Cir. 2020). The most appropriate remedy for a due process violation like this one, where a person living peacefully in the community was abruptly detained with no pre-deprivation notice, is release on recognizance without the use of alternatives to detention or other conditions. *See Rivera Zumba*, 2025 WL 2753496, at *11 (ordering release and enjoining respondents from re-arresting petitioner under § 1225(b)); *Mata Velasquez v. Kurzdorfer*, No. 25-cv-493, 2025 WL 1953796 (W.D.N.Y. July 16, 2025) (ordering release and that petitioner could not be re-detained without a pre-deprivation hearing); *Hyppolite,* 2025 WL 2829511, at *17 (same); *Chipantiza-Sisalema*, No. 25-cv-5528, 2025 WL 1927931, at *4 (S.D.N.Y. July 13, 2025) (ordering immediate release); *Munoz Materano*

*v. Arteta*, 2025 WL 2630826, at *20 (S.D.N.Y. Sept. 12, 2025 (same); *Rueda Torres v. Francis*, 25-cv-8408, 2025 WL 3168759, at *6 (S.D.N.Y Nov. 13, 2025 (same).

78.    In the alternative, the habeas court can hold its own custody hearing and determine whether the government can prove by clear and convincing evidence that Eduardo must remain in custody, or whether he may be released on recognizance, an appropriate bond in light of his ability to pay, or supervised release. S*ee L.G.M. v. LaRocco*, 788 F.Supp.3d 401, 405-07 (E.D.N.Y. 2025) (ordering a bond hearing held by the habeas court, as this would be more efficient than delegating the task to the agency and ensure proper constitutional oversight).

## CLAIMS FOR RELIEF
## COUNT I
### Fifth Amendment: Violation of Procedural Due Process

79.    Petitioner repeats and incorporates by reference each allegation contained in the preceding paragraphs.

80.    The procedural due process guarantee of the Fifth Amendment requires that individuals be provided notice and an opportunity to be heard before being deprived of liberty or property interests. *Mathews*, 424 U.S. at 332. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690.

81.    Under the familiar *Mathews v. Eldridge* test, then, the government's decision to arrest Eduardo without any notice or an opportunity to respond, and to continue to detain him without any opportunity to meaningfully challenge that detention, clearly violates his procedural due process rights. Further, Respondents neither gave Eduardo a warning that he would be detained in ICE custody upon his 18th birthday nor the opportunity to contest that detention. The government's decision to arrest Eduardo without any notice or an opportunity

22

to respond and to continue to detain him without any opportunity to meaningfully challenge that detention, clearly fails *Mathews*.

82.    First, Eduardo has a substantial, legally protectable liberty interest. *Velasco Lopez v. Decker*, 978 F.3d 842, 851 (2d Cir. 2020) ("the interest in being free from imprisonment" is "the most significant liberty interest there is").

83.    Second, the risk of erroneously depriving Eduardo of that interest is severe. At only 17 years old, he was separated from his family and community. He was thrown into sudden instability when he was ripped apart from his family and remained detained in at least one abusive facility for over 8 months. He has been afforded absolutely no process, let alone constitutionally sufficient process, prior to or since this deprivation, making the value of additional process high. *See Eldridge*, 424 U.S. at 343. To protect against the risk of erroneous deprivation, the government must provide a custody hearing in which it must justify his detention based on a showing of changed circumstances. *See Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1176 (N.D. Cal. 2017) (finding government required to provide prompt hearings to re-detained unaccompanied minors), *aff'd sub nom. Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018).

84.    Third, the government's interest in detaining Eduardo is minimal. On the one hand, the government has no interest in detaining noncitizens—especially children—who present no flight risk or danger. Prior to his re-detention in 2025, Eduardo was firmly settled in Texas and Oklahoma, surrounded by family. Eduardo does not present any flight risk or danger: he has been firmly settled in the United States since the age of 15, has a supportive familial life with his mother and sister, and has no pending criminal cases, charges, or felony history. He remained in ORR custody for close to eight months in contravention of ORR's duty to release him efficiently because he presents no risk to himself, his sponsor, or the community. Ex. C. Although Eduardo had certain

behavioral incidents during his time in ORR custody, his advocate from the Young Center emphasized that as a survivor of trafficking and other severe forms of violence, "Eduardo's behavior needs to be considered alongside his complex trauma, in addition to his length of stay in a restrictive setting." Ex. D. The advocate also noted that Eduardo was "engaging in clinical sessions" and that "he continuously attempts to practice utilizing his coping skills." *Id*. Even so, his Young Center advocate recommended his release, noting that his behavior "has not been dangerous." *Id*. However, he was transferred to ICE custody rather than being released to his sister, who had completed a sponsorship application. On the other hand, additional process would entail little to no burden on the government. *See Mathews*, 424 U.S. at 347. Indeed, "additional procedural safeguards" would not "undercut [the government's] interests" in ensuing that Eduardo comply with any requirements placed on him. *Black v. Decker*, 103 F.4th 133, 153 (2d Cir. 2024). And "additional resources that the government will need to expend to justify continued detention at bond hearings will be minimal—and will likely be outweighed by costs saved by reducing unnecessary detention." *Id*. at 154–55. Further, a core function of ORR pursuant to its statutory mandate is to routinely make determinations about whether unaccompanied minors' detention is necessary or if they can be released to an adult in the community. *See Saravia*, 905 F.3d at 1140 (discussing ORR's obligations to make such custody determinations).

85.    Eduardo's transfer to ICE detention from ORR and his continued detention without an opportunity to be heard violates his procedural due process rights under the Fifth Amendment of the Constitution. Eduardo's transfer to ICE detention from ORR without an opportunity to be heard therefore violates his procedural due process rights under the Fifth Amendment of the Constitution.

## COUNT II

24

**Violation of the William Wilberforce Trafficking Victims Protection Reauthorization Act (TVPRA) and the Immigration and Nationality Act (INA)**

86.     Petitioner incorporates by reference the allegations in the preceding paragraphs.

87.     Under the TVPRA, 8 U.S.C. § 1232(c)(2)(B), U.S. Immigration and Customs Enforcement ("ICE") is required to consider the "least restrictive setting" for noncitizens transitioning from the custody of the Office of Refugee Resettlement ("ORR") to adult detention upon their eighteenth birthday ("age-outs"). This determination must be "driven" by an individualized assessment of the individual's danger to self, danger to the community, and risk of flight. *Garcia Ramirez v. ICE*, 812 F. Supp. 3d 86, 102 (D.D.C. 2025).

88.     Respondents have failed to comply with these statutory requirements in the case of Eduardo. Instead of the planned release to Eduardo's sister, Respondents transferred Eduardo to an adult detention facility rather than considered this alternative.

89.     Upon information and belief, Respondents failed to properly document or consider the least restrictive alternative for Eduardo as required by the 2022 *Garcia Ramirez* Settlement Agreement and the permanent injunction issued in that litigation. *See Garcia Ramirez v. ICE*, 568 F. Supp. 3d 10, 47 (D.D.C. 2021).

90.     The mandatory detention provision at 8 U.S.C. § 1225(b)(2) does not apply to all noncitizens residing in the United States who are subject to the grounds of inadmissibility. As relevant here, it does not apply to those who previously entered the country and have been residing in the United States, such as Eduardo.

91.     By applying a presumption of detention or relying on the mandatory detention provision of 8 U.S.C. § 1225(b)(2) to justify Eduardo's transfer, Respondents have violated the TVPRA and the INA. This application of the law unlawfully mandates Petitioner's continued detention without the individualized, statutory review to which he is entitled.

25

## COUNT III

### Violation of the Administrative Procedure Act, 5 U.S.C. §§ 702, 706 (Arbitrary and Capricious)

92.    Petitioner incorporates by reference the allegations of fact set forth in preceding paragraphs.

93.    Under the Administrative Procedure Act, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," that is "contrary to constitutional right [or] power," or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

### *Placement of Eduardo in ICE Custody Violates the APA*

94.    Additionally, and independently, Respondents acted arbitrarily, capriciously, and contrary to law by disregarding the controlling child-welfare framework governing custody and release of immigrant children. Congress, through the HSA and the TVPRA, requires that unaccompanied children be maintained in the least restrictive setting appropriate to their needs and that the government undertake prompt and continuous efforts toward placement with qualified family sponsors. *See* 6 U.S.C. § 279(b)(1)(C)–(D); 8 U.S.C. § 1232(c)(2). DHS's own juvenile regulation likewise requires prompt transfer and child-appropriate custody decisions. *See* 8 C.F.R. § 236.3 (including transfer to HHS/ORR within 72 hours). And the *Flores* Settlement Agreement requires release "without unnecessary delay" and prioritizes placement in the community.

95.    Respondents' decision to detain Petitioner flies in the face of the statutory regime's contemplation that minors remain in the least restrictive setting.

96.    By seizing a then seventeen-year-old from an existing, stable family home in the Texas—where he had been living with relatives—and funneling him toward institutional

26

custody (first ORR and now ICE), Respondents ignored an "important aspect of the problem," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), inverted the statutory sequence that favors family placement over institutional care, and failed to explain why less-restrictive alternatives (further check-ins or immediate reunification with the identified family sponsor) were inadequate. Respondents were obligated to preserve (or at least assess and document) the already-available relative sponsor and to coordinate release consistent with § 1232(c)(2)–(3) and *Flores*. Their failure to perform that analysis renders the decision unreasoned. *See Judulang v. Holder*, 565 U.S. 42, 53 (2011).

## COUNT IV

## RELEASE PENDING ADJUDICATION

97.     Petitioner incorporates by reference the allegations of fact set forth in preceding paragraphs.

98.     Pursuant to *Mapp v. Reno*, this Court has the "inherent authority" to set bail pending the adjudication of a habeas petition when the petition has raised (1) substantial claims and (2) presents extraordinary circumstances that (3) "make the grant of bail necessary to make the habeas remedy effective," 241 F.3d 221, 226 (2d Cir. 2001).

99.     Eduardo asserts numerous substantial constitutional and statutory claims challenging his detention.

100.    Eduardo has also demonstrated multiple extraordinary circumstances which make him eligible for bail, including his young age, his status as a survivor of trafficking and severe abuse, and the trauma of family separation that may be nearly impossible to remedy post-detention.

101.    He respectfully requests immediate release pending adjudication of the instant

petition.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner requests that this Court:

a.      Assume jurisdiction over this matter;

b.      Order that Petitioner shall not be transferred outside the Southern District of New York, or in the alternative, the New York-New Jersey area, while this habeas petition is pending;

c.      Issue an Order to Show Cause ordering Respondents to show cause why this Petition should not be granted within three days;

d.      Issue a Writ of Habeas Corpus requiring that Respondents immediately release Petitioner without conditions of supervision or alternatives to detention; or, in the alternative, that this Court hold a bond hearing within seven days at which the government bears the burden to justify that his continued detention is necessary by clear and convincing evidence;

e.      Declare that Petitioner's arrest and ongoing detention are unlawful;

f.      Award reasonable attorney's fees and costs pursuant to the Equal Access to Justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412; and

g.      Grant any other and further relief that this Court deems just and proper.

Dated this 16th day of April 2026

Respectfully Submitted,

/s/ Beth D. Baltimore
Beth D. Baltimore
Lauren Fouda
Jamie Kessler
THE DOOR'S LEGAL SERVICES CENTER
121 Avenue of the Americas, 3rd Floor
New York, New York 10013
917-701-9130
bbaltimore@door.org

28

*Attorneys for Petitioner*

Type text here

## <u>VERIFICATION PURSUANT TO 28 U.S.C. § 2242</u>

I am submitting this verification on behalf of the Petitioner because I am one of the Petitioner's attorneys. I have discussed with the Petitioner's legal team the events described in this Petition. On the basis of those discussions, on information and belief, I hereby verify that the factual statements made in this Petition and Complaint are true and correct to the best of my knowledge.

Dated this 16th day of April 2026.

_____
Dalilah Negrete, Esq.